UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RASZELL REEDER,

                              Plaintiff,

 v.                                                    9:09-CV-520
                                                       (NAM/ATB)
M. HOGAN, et al,

                              Defendants.

RASZELL REEDER, Plaintiff, pro se
JUSTIN C. LEVIN, Assistant Attorney General

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT AND RECOMMENDATION

I.     **Background**

       Plaintiff commenced this action pro se, seeking damages for injuries

resulting from various incidents occurring between 2007 and 2008.  (Dkt. No. 1).

Liberally construed, plaintiff's original complaint set forth several First and Eighth

Amendment claims, including excessive force, denial of medical care, failure to

receive proper Ramadan meals, and challenges to his conditions of confinement.

*Id.*  Plaintiff filed an amended complaint on January 4, 2010 (First Amended

Complaint).  (Dkt. No. 84).  Plaintiff's First Amended Complaint identified

defendants originally named as John Doe and Jane Doe, but was identical to his

original complaint in all other respects.  *Id.*

On November 16, 2009, defendants filed a motion to dismiss the First Amended[1] Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 69).  On September 29, 2010, then-Chief District Judge Mordue granted defendants' motion in part and denied it in part.  (Dkt. No. 122).  On October 8, 2010, this action was referred to Magistrate Judge Victor E. Bianchini for settlement proceedings, pursuant to the Pro Se Prisoner Settlement Program, and the case was stayed in all other respects until the proceedings were completed.  (Dkt. No. 124).

On November 1, 2010, plaintiff filed a motion to amend, together with a Second Amended Complaint.  (Dkt. No. 129).  In light of the stay, the Court did not address the motion.  On January 31, 2011, the stay was lifted.  (Dkt. No. 133). Before this Court could address plaintiff's November 1, 2010 motion, plaintiff filed another motion to amend on May 4, 2011, together with a Third Amended Complaint.  (Dkt. No. 141).  In an order dated June 22, 2011, this court denied plaintiff's motion to amend filed on May 4, 2011, but granted, in part, the November 1, 2010 motion.  (Dkt. No. 145).  The operative pleadings are plaintiff's First Amended Complaint, filed January 4, 2010, without the claims that were

_____

[1] Although the motion to dismiss was filed prior to the acceptance of the amended complaint by the court, the only amendment to the original complaint was the addition of two named defendants in place of two of the John/Jane Doe defendants.  The new defendants and the original defendants who were served with the original complaint after the motion to dismiss was filed, requested that they be allowed to join the pending motion to dismiss.  (Dkt. Nos. 72, 87). The court granted these requests.  (Dkt. Nos. 77, 88).

dismissed as a result of Judge Mordue's September 29, 2010 Order, read together with plaintiff's Second Amended Complaint.  Defendants filed a motion for summary judgment on December 27, 2011.  (Dkt. No. 150).  Plaintiff filed a response on January 9, 2012.  (Dkt. No. 154).

## II.   Remaining Claims

Four categories of claims remain for consideration:

1.   Free Exercise of Religion:

Plaintiff claims that he was denied his Ramadan meals. This claim remains only against defendant Archambault. (First Am. Compl. ¶¶ 29, 37).

2.   Medical Care:

a)   Plaintiff alleges that he was denied proper medical care when he was sent to Clinton Correctional Facility, but was never placed in the appropriate mental health program.  This claim remains against defendants Hogan, Fischer, Bosco, Waldron, Roy, Artus, LaValley, and Racette. (First Am. Compl. ¶ 19).

b)   Plaintiff alleges that defendants Fitzgerald and Farnan[2] denied him proper medical care after he was allegedly assaulted on August 24 and 25 of 2008.[3] (First Am. Compl. ¶¶ 27, 43).

---

[2] Plaintiff spells defendant Farnan's name "Larnan," but defendant Farnan's Declaration indicates that the proper spelling is "Farnan."  The court will refer to this defendant as "Farnan."

[3] Plaintiff initially stated in his complaint that the assaults occurred in July 2008, but plaintiff clarified in his deposition that the alleged assault and subsequent denial of medical care was in August 2008.  (Pl.'s Dep. 56).  The court will now refer to the alleged assaults as

3.    Excessive Force:

Plaintiff claims that he was the victim of excessive force used against him on August 24 and 25 of 2008. Although it still does not appear that plaintiff knows who assaulted him on August 24, he states that defendants Hogan, Bosco, and Waldron are responsible for this assault.  Plaintiff claims that one unnamed sergeant[4] and two unnamed corrections officers assaulted him on August 25, and claims that defendants Uhler and Allen are responsible.  Plaintiff also alleges that defendants Marcil and an unknown observation officer used mace against plaintiff on August 25. (First Am. Compl. ¶¶ 20, 21, 22, 41, 42; Pl.'s Dep. 56, 97–98, 104–08).

4.    Conditions of Confinement:

a)    Plaintiff alleges that he was denied toiletries, including soap and toilet paper between January 5, 2009 and January 28, 2009.  He claims that defendants Ludwig, Artus, Lavalle, Savage, and Racette are responsible. (First Am. Compl. ¶¶ 30, 47).

b)    Plaintiff claims that he was denied food at different times during this period and alleges that defendants Mosley, Besaw, Artus, Lavalle, Poupoure, Tetreault, Boulrice,[5] and Finnel are responsible for this deprivation.  (First Am. Compl. ¶¶ 34, 50).

occurring in August 2008.

[4] Plaintiff clarified in his deposition that the Sergeant was Sergeant Rendle, who is not a defendant in this action.  (Pl.'s Dep. 72).

[5] There is no defendant named Boulrice in the caption of the amended complaint, and the other defendants whose names begin with "B," do not have names that are even similar to Boulrice.  This court cannot even speculate as to whom plaintiff might be referring in this part of his amended complaint.

c)  Plaintiff claims that defendant Artus is responsible for failing to repair the loud banging coming from pipes near his cell. (Second Am. Compl. ¶¶ 4–6).

## III.  <u>Facts and Contentions</u>

Plaintiff was incarcerated at Upstate Correctional Facility ("Upstate") in 2007 and then was transferred to Elmira Correctional Facility ("Elmira") in 2008, where he participated in a group therapy program.  (First Am. Compl. ¶¶ 13–15). After about four weeks, plaintiff was transferred from Elmira to Great Meadow Correctional Facility ("Great Meadow") where he participated in a different mental health program.  (First Am. Compl. ¶¶ 15–16).  Plaintiff claims that he has been "deprived [of his] mental health treatment because of constant movement to different facility programs."  (First Am. Compl. ¶ 18).

While plaintiff was at Great Meadow, defendant Howard allegedly "got [plaintiff] relocated" to the "last cell and with feces in it" and told other correctional officers that when plaintiff was at Upstate, plaintiff had attacked defendant Howard's friend.  (First Am. Compl. ¶¶ 16, 36, 39, 52).  Plaintiff had interacted with defendant Howard at Upstate and Downstate Correctional Facilities.  (First Am. Compl. ¶ 52).  Plaintiff indicates that while he was a part of the Great Meadow B.H.U.[6] program, plaintiff was "given a new criminal charge,"

_____

[6] Behavioral Health Unit.  *See* Pl.'s Dep. 32.

but gives no explanation as to the surrounding facts or its relevance.  (First Am. Compl. ¶ 16).

Plaintiff complained to defendant Hicks at Great Meadow that he was "never suppose[d] to be transfer[r]ed out of Elmira," but "she still did nothing except sent me to Clinton Correctional Facility [group therapy] program" later in 2008.  (First Am. Compl. ¶ 17).  At Clinton, plaintiff "experienced constant assaults [and] wasn't fed for two daily meals[, and w]hile at O.B.S. [plaintiff] was extremely cold and in strong pain."  (First Am. Compl. ¶ 28).  Plaintiff alleges that he was "denied my religious practive [sic] to eat ramadan meals" for the entire month when ramadan is celebrated.[7]  (First Am. Compl. ¶ 29, 46).

On August 24, 2008, plaintiff "committed a[n] aggr[a]vated assault charge," and was placed in "full restraints and assaulted in the back of [his] cell" at Clinton by unnamed defendants.  (First Am. Compl. ¶¶ 20, 40; Pl.'s Dep. 56).  The aggravated assault charge resulted because plaintiff threw urine and feces on a nurse and corrections officer.  (Pl.'s Dep. 57).  After being placed in restraints, plaintiff alleges that excessive force was used when he was made to lie on the floor.  (Pl.'s Dep. 69).  After the incident, defendant nurse Fitzgerald evaluated

---

[7] Plaintiff claims in his Response to Defendants' Motion to Dismiss that he received one Ramadan meal during the month of Ramadan.  (Dkt. No. 73 at 10).

plaintiff from about five feet away, and from behind a plexiglass shield, which plaintiff alleges was "unclean" and "gives unclear vision." (First Am. Compl. ¶26; *see also* Pl.'s Dep. 66, 118–23). Plaintiff allegedly received no treatment for the resulting bruises, swelling, or the "excruciating pain [he] was constantly feeling." (First Am. Compl. ¶¶ 26–27; Pl.'s Dep. 124–26).

Plaintiff was moved to the observation area of the mental health clinic, and the next day, plaintiff alleges that he was sleeping, and unknown corrections officers entered his cell and began punching and kicking plaintiff. (First Am. Compl. ¶ 21, 40; *see also* Pl.'s Dep. 65, 89–93). Sergeant Rendle[8] and two unknown corrections officers returned a few minutes later and began "punching [plaintiff], kicking [plaintiff], and kneeing [plaintiff]." (First Am. Compl. ¶ 22, 40; Pl.'s Dep. 75). Another officer stood at the door, holding it open. *Id.* After assaulting plaintiff for another three minutes, they "ran out the cell door." *Id.* Plaintiff alleges that the unidentified corrections officer who held the door also refused to feed plaintiff breakfast and lunch. *Id.*

Plaintiff alleges that later that same day, defendants Uhler, Allen, Marcil, and other corrections officers wanted plaintiff to come out of his cell, but he "disagreed with coming out," because "they did not come with [a] camera." (First

---

[8] Sergeant Rendle is not a defendant in this action.

Am. Compl. ¶ 24, 41).  A "distraction unit" was called, bringing a camera, so plaintiff "agreed to come out," but defendants Uhler, Allen, Marcil and others still used mace "repeatedly."  *Id.*  Plaintiff was placed in full restraints, but the officers failed to lock the cuffs, which caused plaintiff "excruciating pain," and a corrections officer held plaintiff's "arm in an unproffessional [sic] way only intended to cause [plaintiff] extra excruciating pain and he used a[n] untrained hold to apply pressure on my arms and wrist."  (First Am. Compl. ¶ 24, 42; Pl.'s Dep. 109–11).  Plaintiff received an eye examination by defendant nurse Farnan in the SHU "holding pen," but plaintiff received nothing for his bruises, "excruciating pain [he] was constantly feeling," or "swollenness [sic] from my head, face, chest, stomach, left leg, right leg and testicles."  (First Am. Compl. ¶ 27, 43; Pl.'s Resp. to Defs.' Mem. of Law in Supp. of Mot. to Dismiss the Am. First Am. Compl. as to Defs. Farnan and Fitzgerald ¶ 1; Pl.'s Dep. 115–16, 127–29).

On January 5, 2009, plaintiff states that he was "forced to retaliate against a Sgt. and two correction officers for constant harrassment [sic] and constant retaliation . . . and because the administration at Clinton refuse[s] to proffessionally [sic] protect me."  (First Am. Compl. ¶ 28).  The officers then submitted allegedly false reports stating that the personal property inside

plaintiff's cell was also contaminated and needed to be destroyed.  (First Am. Compl. ¶ 51).  Plaintiff's property was placed in a bag and destroyed due to a report indicating that it was "contaminated."  (First Am. Compl. ¶ 35).  Plaintiff claims that only "one pair of state pants and short sleeve shirt, one pair of state sox, [sic] one pair of state undershirt and undershorts was contaminated and that was outside my cell at the back of the cell outside cell entrance."  (First Am. Compl. ¶51).

The state property that was destroyed was valued at $152.64, and plaintiff's property, "five Vibe magazines, 1 bible, 7 personal letters, [and] 1 pair of slippers" were valued at $36.25.  (First Am. Compl. ¶ 35).  The loss of his slippers prevented plaintiff from showering.  (First Am. Compl. ¶ 35).  After plaintiff attempted to assault the officers on January 5, 2009, he claims he was placed "back in S.H.U. 2 cell" that only had a mattress with "huge holes and it was torn in many places."  (First Am. Compl. ¶ 30).  Plaintiff alleges he was deprived of writing utensils, paper, grievance forms, envelopes, sheets, blankets, washcloths, soap, a pillow or pillowcase, towels, toilet paper, a toothbrush, toothpaste, and a sweatshirt.  (First Am. Compl. ¶ 30).  Plaintiff claims that it took until January 23, 2009, for him "to receive most items back."  (First Am. Compl. ¶ 30).

For ten days following the January 5, 2009 incident, plaintiff claims he went

without food and then only received one meal a day for four more days. (First Am. Compl. ¶ 34, 50). Plaintiff refused to eat during the final four days because "they spit in it or put dirt in it." (First Am. Compl. ¶ 34). Plaintiff was "denied toilet paper for six days while they offer[ed] to feed me." (First Am. Compl. ¶ 47). Plaintiff also felt cold because of a broken window that was not fixed until January 28, 2009. (First Am. Compl. ¶ 30, 47). Plaintiff spoke to defendants Artus and LaValley[9] on January 13, 2009, but "neither did nothing," telling plaintiff that "it's a security concern." (First Am. Compl. ¶ 34, 38, 47). Plaintiff claims that "grievance investigations are not done proffessionally [sic]" or not investigated at all, and defendant Brousseau "neglects her responsibility" as I.G.P. Supervisor by "not using her powers . . . to enforce her authority against Clinton Correctional Facility Administration." (First Am. Compl. ¶ 38).

Plaintiff was not included in the group therapy program at Clinton in 2009, which plaintiff alleges is because "the grievance system never conduct proffessional [sic] investigations it has constant incomp[e]tents." (First Am. Compl. ¶ 19). Plaintiff asserts that his exclusion from the Clinton group therapy program "has nothing to do with the criminal charge at Great Meadow." *Id.*

---

[9] Plaintiff spells defendant LaValley's name "Lavalle," but defendant LaValley's Declaration indicates that the proper spelling is "LaValley." The court will refer to this defendant as "LaValley."

Plaintiff also complains of the "loudness of the very loose pipes banging against each other and against the wall," which causes plaintiff an "extreme amount of uneasiness," loss of concentration, and gives him migraine headaches. (First Am. Compl. ¶ 31, 48). Plaintiff alleges that his "mental health is constantly worst [sic] and noone [sic] is helping me I have no other choice but to keep throwing feces and looking a[t] the people that walk bye [sic] that's [sic] responsible for not fixing these constant attacks when they were warned repeatedly. My brain be [sic] getting angry." (Pl.'s Resp. to Defs.' Mot. to Dismiss Compl. p. 11).[10]

Defendants argue that plaintiff has failed to exhaust his administrative remedies as to his claims based on excessive force, deliberate indifference to a serious medical need, and denial of food. They argue that he cannot establish a claim based on the Eighth Amendment, that he cannot establish a claim based on the First Amendment, and that defendants are protected by qualified immunity. The court will analyze plaintiff's claims in turn as they were listed above.[11] For

_____

[10] Plaintiff does not number the pages in his response, so the court will refer to the page numbers assigned by the CM/ECF system.

[11] Plaintiff has named me as a defendant in a case filed in the Northern District of New York. (*Reeder v. Allen, et al.*, Case No. 10-CV-959). Although plaintiff has not moved for my recusal in this case, to the extent that it is necessary to discuss the issue, it is clear that "a judge is not required to recuse him- or herself simply because a litigant before the judge has filed suit or made a complaint against him or her." *See Jenkins v. Sladkus*, No. 04 Civ. 1595, 2004 WL

the reasons below, the court recommends granting defendants summary judgement in part and denying defendants summary judgment in part.

## II.   <u>Summary Judgment</u>

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990).  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment."  *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987) (citation omitted).  A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

---

1238360, 2004 U.S. Dist. LEXIS 10320 at *4 (S.D.N.Y. June 3, 2004) (citing *United States v. Nagy*, 19 F. Supp. 2d 139, 140–41 (S.D.N.Y. 1998).  Thus, notwithstanding plaintiff's attempt to name me as a defendant in *Reeder v. Allen*, No. 9:10-CV-959, there is no basis for me to recuse myself in this action.

demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56 (c)(1)(A).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48.

## III.   <u>Personal Involvement</u>

Plaintiff has alleged claims against many defendants in supervisory roles. Defendants allege that many claims should be denied due to a lack of personal involvement.

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319,

323–24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a

defendant can be personally involved in a constitutional deprivation, and thus be

subject to individual liability.

A supervisory official is personally involved if that official directly

participated in the infraction. *Id.* The defendant may have been personally

involved if, after learning of a violation through a report or appeal, he or she failed

to remedy the wrong. *Id.* Personal involvement may also exist if the official

created a policy or custom under which unconstitutional practices occurred or

allowed such a policy or custom to continue. *Id.* Finally, a supervisory official

may be personally involved if he or she were grossly negligent in managing

subordinates who caused the unlawful condition or event. *Id. See also Iqbal v.

Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d

865, 873) (2d Cir. 1995)), *rev'd on other grounds*, 556 U.S. 662 (2009).

The failure of a supervisory official to investigate a letter of protest written

by an inmate is insufficient to establish personal involvement. *Smart v. Goord*,

441 F. Supp. 2d 631, 642–643 (S.D.N.Y. 2006). Mere notice of alleged

wrongdoing is insufficient to establish a supervisor's or administrator'[s] personal

involvement. *Gibson v. Comm'r of Mental Health*, No. 04 Civ. 4350, 2008 WL

4276208, at *8, 2008 U.S. Dist. LEXIS 70080, at *27 (S.D.N.Y. Sept. 17, 2008).

While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . '[p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.'" *Boddie v. Morgenthau*, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) (quoting *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002).

The court will analyze defendants' arguments based on a lack of personal involvement in the relevant sections, which are separated according to plaintiff's alleged constitutional claims.

## IV.   First Amendment Claims

### A.    Free Exercise

Plaintiff claims that his rights under the First Amendment were violated when he was deprived of "Ramadan meals." (First Am. Compl. ¶¶ 29, 46). The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns, including those

15

relating to institutional security." *Johnson v. Guiffere,* 04-CV-57, 2007 WL 3046703, at *4, 2007 U.S. Dist. LEXIS 77239 (N.D.N.Y. Oct.17, 2007).  The Free Exercise Clause extends "beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet. . . ." *Id*.  The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples. . . ." *Ford,* 352 F.3d at 597 (citations omitted).  Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir. 2004).

Plaintiff claims that he was denied meals during Ramadan, a holy month in Islam when observant Muslims fast between sun up and sun down.  *See generally Ford v. McGinnis,* 352 F.3d 582, 585 (2d Cir. 2003) (discussing the general aspects of Ramadan and some of the accommodations made by DOCCS).  Plaintiff claims he gave a grievance about his lack of Ramadan meals to Sergeant Archambault, the "grievance sergeant," but his grievance did not reach the grievance office or the Muslim chaplain.  (First Am. Compl. ¶ 29, Pl.'s Resp. to Defs.' Mot. to Dismiss p. 10).  Plaintiff was later told by the Imam that he "wasn't on the mess hall list for Ramadan or the Ramadan list in [the Imam's] office," despite the fact that plaintiff "[has] Islam on the facility computer at Clinton. *Id.*

16

Plaintiff does not allege that defendant Archambault denied him any meals, but only states that he lied about receiving plaintiff's grievances, which is consonant with plaintiff's description of defendant Archambault as the "Grievance Sergeant" of the SHU.  (First Am. Compl. ¶ 29).  However, plaintiff testified that defendant Archambault told plaintiff that Archambault had delivered the grievance, and plaintiff's claims had been investigated.  (Pl.'s Dep. 142–43).  Plaintiff also testified that he failed to file another grievance because defendant Archambault told plaintiff that the grievance had been processed, and that plaintiff should begin receiving Ramadan meals.  (Pl.'s Dep. 144).  Plaintiff testified that he did not know who denied him his Ramadan meals.  (Pl.'s Dep. 140).

Defendant Archambault affirmed that his duties as Grievance Sergeant did not include providing meals—during Ramadan or otherwise.  (Archambault Decl. ¶ 7).  Defendant Archambault's duties included speaking personally with inmates housed in the SHU regarding their grievances, providing them with the necessary forms to file grievances, and discussing the grievance process with them. (Archambault Decl. ¶ 8).  Defendant Archambault affirmed that he "never allowed inmates to hand me Inmate Grievance Complaints for filing with the Grievance Office," and if an inmate were to try and give him a grievance, he "would not accept the grievance and [he] would advise the inmate to sent it to the Grievance

17

Office through facility mail." (Archambault Decl. ¶¶ 8, 10).

"Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a Section 1983 cause of action." *Liner v. Goord*, 310 F. Supp. 2d 550, 555 (W.D.N.Y. 2004). *See, e.g., Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (summary judgment affirmed where commissioner referred plaintiff's letter to the prison superintendent); *Garvin v. Goord*, 212 F. Supp. 2d 123, 126 (W.D.N.Y. 2002) (granting summary judgment to DOCS commissioner based on lack of personal involvement); *Farid v. Goord*, 200 F. Supp. 2d 220 (W.D.N.Y. 2002) (dismissing action against DOCS commissioner and prison superintendent for lack of personal involvement where plaintiff merely sent petition to them and each referred the petition down the chain of command for investigation.)

Similar to where a supervisor forwards an inmate's complaint to the appropriate destination for resolution, defendant Archambault's responsibility as Grievance Sergeant was to explain the grievance process, provide forms, and direct inmates how to use the process. Even if defendant Archambault was aware that plaintiff was not receiving Ramadan meals, he was not in a position to remedy the situation. As the Grievance Sergeant, his responsibility was to refer plaintiff to

the grievance program, providing explanations and forms if necessary, and had

nothing to do with plaintiff's meals.[12]

The court declines to find personal involvement by defendant Archambault

related to a grievance he would not have taken from plaintiff and would have been

in no position to correct even if he did take the grievance from plaintiff.  Summary

judgment should be granted as to defendant Archambault regarding plaintiff's

alleged violation of the Free Exercise Clause and plaintiff's First Amendment

claim should be dismissed.

## V.   <u>Eighth Amendment Claims</u>

### A.   **Medical Indifference**

Plaintiff claims that defendants Hogan, Fischer, Bosco, Waldron, Roy,

Artus, LaValley, and Racette deprived him of mental health treatment when he

was transferred to Clinton and was not placed in the appropriate mental health

---

[12] Evan if defendant Archambault had taken plaintiff's grievance and failed to mail it, as plaintiff alleges in his Response Opposing Defendants['] Motion [for] Summary Judgment (Dkt No. 154 ¶ 4), this interference with the grievance process would not rise to the level of a constitutional claim.  The law is well-settled that inmates do not have a constitutional right to grievance procedures.  *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003); *Davis v. Buffardi*, No. 0:01-CV-0285, 2005 WL 1174088, at *3, 2005 U.S. Dist. LEXIS 45487 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[p]articipation in an inmate grievance process is not a constitutionally protected right") (citations omitted).  Furthermore, a violation of the inmate grievance procedures does not give rise to a claim under section 1983.  *Cancel v. Goord*, No. 00 CIV. 2042, 2001 WL 303713, at *3,  2001 U.S. Dist. LEXIS 3440 (S.D.N.Y. Mar. 29, 2001).

program.  He also asserts that defendant nurses Fitzgerald and Farnan were deliberately indifferent to his medical needs because they did not examine or treat him appropriately.

### 1.    Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### a.    Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious."  *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  Determining whether a deprivation is sufficiently serious also involves two inquiries.  *Id.*  The first question is whether the plaintiff was actually deprived

of adequate medical care.  *Id.*  Prison officials who act "reasonably" in response to

the inmates health risk will not be found liable under the Eighth Amendment

because the official's duty is only to provide "reasonable care."  *Id.* (citing

*Farmer*, 511 U.S. at 844–47).

The second part of the objective test asks whether the purported inadequacy

in the medical care is "sufficiently serious."  *Id.* at 280.  The court must examine

how the care was inadequate and what harm the inadequacy caused or will likely

cause the plaintiff.  *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)).

If the "unreasonable care" consists of a failure to provide *any* treatment, then the

court examines whether the inmate's condition itself is "sufficiently serious."  *Id.*

(citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)).  However, in

cases where the inadequacy is in the medical treatment that was actually afforded

to the inmate, the inquiry is narrower.  *Id.*  If the issue is an unreasonable delay or

interruption of ongoing treatment, then the "seriousness" inquiry focuses on the

challenged delay itself, rather than on the underlying condition alone.  *Id.* (citing

*Smith*, 316 F.3d at 185).

### b.    Subjective Element

The second element is subjective and asks whether the official acted with "a

sufficiently culpable state of mind."  *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300

(1991)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care.  *Id.* (citing *Farmer*, 511 U.S. at 835–37).  Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition.  *Id.*  Deliberate indifference is equivalent to subjective recklessness.  *Id.* (citing *Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702).  The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference.  *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent."  *Farmer*, 511 U.S. at 844.  Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable."  *Salahuddin* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

2.     **Application**

a.      **Purported Deprivation of Mental Health Treatment**

Plaintiff claims that defendants Hogan, Fischer, Bosco, Waldron, Roy, Artus, LaValley, and Racette "deprived" plaintiff of his mental health treatment "because of constant movement to different facility programs."  (First Am. Compl. ¶ 18–19).  It is well-settled that an inmate has no right to incarceration in any particular facility.  *See Wilkinson v. Austin*, 545 U.S. 209, 221–222 (2005) (citing *Meachum v. Fano*, 427 U.S. 215, 225) (1976).  In *Wilkinson*, the court stated that confinement in any one of a state's institutions is within the normal range of custody which the conviction has authorized that state to impose.  *Id.* at 222.  In regards to which mental health program plaintiff preferred, mere disagreement with prescribed treatment does not rise to the level of a constitutional claim.  *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d at 31.  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates.  *Id.*  (citations omitted).  An inmate does not have the right to treatment of his choice.  *Dean v. Coughlin*, 804 F.2d at 215.  The fact that plaintiff might have preferred an alternative treatment, or believes that he did not get the medical attention he desired, does not rise to the level of a constitutional violation.  *Id.*

24

Plaintiff was in the mental health unit at Upstate in 2007, was sent to Elmira to participate in a mental health program for four weeks in 2008, and then sent to the Great Meadow B.H.U later that same year.  (First Am. Compl. ¶¶ 13–17; Pl.'s Dep. 32).  At Great Meadow, plaintiff complained to the B.H.U. Supervisor, defendant Hicks, that he was "not suppose[d] to be in the B.H.U. program and . . . [plaintiff] was never suppose[d] to be transfer[r]ed out of [the] Elmira G.T.P. program."  (First Am. Compl. ¶ 17).  Plaintiff was then transferred to Clinton later in 2008.  (First Am. Compl. ¶ 19; Pl.'s Dep. 32).  It is evident that plaintiff was getting mental health treatment at the different facilities in which he was housed.  Plaintiff may prefer the program at Elmira, but being transferred out of that facility and that particular program does not rise to the level of a constitutional violation.

Plaintiff appears to allege that defendants Fischer, Hogan, Roy, Artus, LaValley, and Racette are responsible for the alleged deprivation of plaintiff's mental health treatment due to their supervisory status.  Defendant Fischer is the Commissioner of the New York State Department of Corrections and Community Supervision.  (Fischer Decl. ¶ 1).  Commissioner Fischer affirmed that he does not personally read the thousands of letters addressed to him each year by inmates.  (Fischer Decl. ¶¶ 15–16).  Correspondence is forwarded to the appropriate division or bureau for further action, if necessary.  (Fischer Decl. ¶ 16).

25

Correspondence may be brought to Commissioner Fischer's personal attention, if necessary, but that did not happen with plaintiff's letters.  (Fischer Decl. ¶ 18, 21).

Defendant Hogan is the Commissioner of the New York State Office of Mental Health.  (Hogan Decl. ¶ 1).  Commissioner Hogan affirmed that he has never assessed plaintiff's mental health needs, he has no involvement in the determination of whether to move an inmate from one correctional facility to another, and is not responsible for the direct supervision of Office of Mental Health employed at correctional facilities.  (Hogan Decl. ¶¶ 8–11).

Defendant Roy was the Deputy Commissioner and Inspector General of New York State Department of Correctional Services (now New York State Department of Corrections and Community Supervision) until his retirement in September 2010.  (Roy Decl. ¶ 1).  Defendant Roy affirmed that he was never personally involved in any matters included by plaintiff in his complaint, and that staff members of the New York State Office of Mental Health at correctional facilities assess the mental health needs of inmates by assigning a mental health service level and transferring inmates to facilities offering services that meet inmates' designated mental health level.  (Roy Decl. ¶¶ 6–8).

Defendant Artus was the Superintendent at Clinton from July 2003 through April 2010.  (Artus Decl. ¶ 4).  Superintendent Artus's responsibilities included

making weekly rounds, including to the SHU, and he remembers speaking to plaintiff on occasion. (Artus Decl. ¶¶ 6–7). Superintendent Artus does not recall ever speaking to plaintiff about the claims he makes in this case, but affirmed that he would have delegated any written complaints from plaintiff to a deputy superintendent for resolution. (Artus Decl. ¶ 7–9).

Defendant LaValley was the First Deputy Superintendent at Clinton from February 2008 through September 2009. (LaValley Decl. ¶ 4). As First Deputy Superintendent, defendant LaValley ensured inmates received appropriate mental health care and therapy programs at Clinton based on their assessed need, as determined by mental health staff. (LaValley Decl. ¶ 8). When plaintiff arrived at Clinton in June 2008, mental health staff designated him as Level 3, which did not qualify him to participate in Clinton's Group Therapy Program. (LaValley Decl. ¶ 10–11). Plaintiff was subsequently designated as a Level 6 (the least serious level), and remained ineligible to participate in the Clinton mental health therapy program. (LaValley Decl. ¶¶ 10–12).

Defendant Racette was the Deputy Superintendent for Security at Clinton from December 2006 through November 2010. (Racette Decl. ¶ 4). As Deputy Superintendent for Security, defendant Racette was responsible for all matters of security, and was in charge of all security staff. (Racette Decl. ¶ 5).

Defendant Bosco was the Forensic Program Administrator with the Office of Mental Health from November 2007 through September 2009. (Bosco Decl. ¶ 5). Defendant Bosco was responsible for the oversight and operation of the Mental Health Units at Clinton, Great Meadow, Coxsackie, Sullivan, and Upstate Correctional Facilities. (Bosco Decl. ¶ 6). Defendant Bosco was not responsible for assessing inmates' mental health services levels and did not participate in assessing plaintiff's mental health service level. (Bosco Decl. ¶¶ 7–9).

Defendant Waldron is the Mental Health Unit Chief at Clinton and is responsible for the oversight, direct supervision, and coordination of Special Programs. (Waldron Decl. ¶¶ 4–6). Defendant Waldron affirmed that a review of plaintiff's mental health records indicates he was transferred to Clinton on June 20, 2008, and a Treatment Plan Review dated June 23, 2008, states that plaintiff "denies any active mental health symptoms," that plaintiff was "noncompliant with treatment," and "[r]efuses all callouts." (Waldron Decl. ¶¶ 7–8, Ex. A to Wald. Decl.). plaintiff's frequent refusal of prescribed medication and recommended treatment, and his chronic non-compliance with the directions of the medical staff further undermines his claims of deliberate indifference on the part of the DOCS medical staff. *See, e.g., Jones v. Smith*, 784 F.2d 149, 151-52 (2d Cir. 1986) (plaintiff's history of declining treatment by prison doctors undermined his claim

28

that they were deliberately indifferent in failing to treat his medical issues).

Plaintiff was evaluated by psychiatrist Dr. Jean Berggren on July 3, 2008, who assigned plaintiff a mental health service level of 3.[13]  (Wald. Decl. ¶ 9, Ex. B to Wald. Decl.).  Defendant Waldron affirmed that as a level 3 patient, plaintiff was not eligible to participate in the group therapy program at Clinton at that time.  (Waldron Decl. ¶ 14).  Defendant Waldron also noted that between plaintiff's arrival at Clinton in June 2008 and November 2008, he was seen on at least 80 occasions by mental health staff, and plaintiff was upgraded to Service Level 6[14] on November 13, 2008.  (Waldron Decl. ¶¶ 15–17, Ex. D to Waldron Decl.).  Defendant Waldron affirmed that changing plaintiff's Mental Health Service Level from a 3 to a 6 was "appropriate and was based upon a thorough assessment of his mental health, his lack of need for medication, and his refusal to accept mental health services."  (Waldron Decl. ¶ 18).  Plaintiff filed a grievance related to the alleged refusal of group therapy.  The CORC found no malfeasance by staff and stated "it is [plaintiff's] extensive disciplinary record and overall poor behavior

---

[13] An inmate who is assigned a mental health service level of 3 "[n]eeds/may need short-term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders OR suffers from a mental disorder which is currently in remission and can function in a dormitory facility which has part-time Mental Health staff."  (Ex. B to Wald. Decl.).

[14] Mental Health Service Level 6 is described as: "Mental health assessment completed—does not require mental health services."  (Ex. C to Waldron Decl.).

that is preventing him from participating in the Group Therapy Program." (Ex. A to Pl.'s Resp. Opposing to Defs.' Mot. for Summ. J. 18).[15]

It is clear from the above that plaintiff began, and continued receiving, mental health treatment at Clinton. The named defendants had nothing to do with his transfer to Clinton. No issue of fact exists as to whether mental health staff were monitoring plaintiff, as he repeatedly, often daily, was observed by staff. (*See* Ex. C to Waldron Decl.). At best, plaintiff disagrees with the evaluations given by medical staff and refused any suggested treatment. (*See* Pl.'s Dep. 39, 42). As mentioned above, plaintiff does not have a constitutional right to the treatment of his choice. Plaintiff correctly acknowledges that his mental health treatment "must be left up to the doctors and the mental health workers." (Pl.'s Dep. 48). Plaintiff names supervisory officials in his claim for deliberate indifference based solely on their supervisory role, which cannot support a claim of deliberate indifference. Because plaintiff cannot establish anything more than a disagreement with prescribed care, he cannot establish deliberate indifference. Accordingly, defendants should be granted summary judgment as to plaintiff's claims based on a denial of mental health treatment.

---

[15] Plaintiff did not number the pages in his exhibit, so the court will use the page numbers assigned by the Case Management/Electronic Case File (CM/ECF) system.

### b.    Defendants Fitzgerald and Farnan

Plaintiff takes issue with defendant nurse Fitzgerald examining plaintiff on August 24, 2008, "at the back of my cell while standing behind a cell shield pexiglass [sic]," because it "gives unclear vision" and plaintiff "never received treatment for [his] bruises and [swelling]."  (First Am. Compl. ¶ 26; Pl.'s Dep. 56; Pl.'s Resp. Opposing Defs.' Mot. for Summ. J. 6).  Plaintiff also complains that defendant Nurse Farnan did not give plaintiff anything for his bruises, swelling, or "excruciating" pain on August 25, 2008.  (First Am. Compl. ¶ 27; Pl.'s Dep. 56; Pl.'s Resp. Opposing Defs.' Mot. for Summ. J. 6–7).

Defendant Fitzgerald affirmed that on August 24, 2008, he viewed plaintiff after plaintiff threw feces and urine on staff.  (Fitzgerald Decl. ¶ 4).  Because plaintiff was compliant with being restrained and removed from his cell, there was no use of force, and defendant Fitzgerald viewed plaintiff through the cell door of the holding area in the SHU.  (Fitzgerald Decl. ¶ 6–7).  Plaintiff alleges that he experienced bruises and a scratch that lasted one to two weeks.  (Pl.'s Dep. 70).  Defendant Fitzgerald viewed no apparent injury and plaintiff denied having sustained any injury, so defendant Fitzgerald concluded that no further physical examination was necessary or required.  (Fitzgerald Decl. ¶ 7,9).  The Ambulatory Health Record Progress Note states that plaintiff obeyed commands and denied

31

any injury.  (Ex. A to Fitzgerald Decl.)  Defendant Fitzgerald noted that plaintiff was "talking to himself, laughing, snickering and then grimacing," and defendant Fitzgerald requested that plaintiff be sent to the mental health unit for observation and evaluation.  (Fitzgerald Decl. ¶ 8; Ex. A to Fitzgerald Decl.).

Defendant nurse Farnan affirmed that she was called to the decontamination shower unit in the mental health cell area on August 25, 2008, to provide a medical health assessment of plaintiff after he had been involved in a cell extraction that involved the use of chemical agents.  (Farnan Decl. ¶ 4). Defendant Farnan saw plaintiff immediately following the decontamination shower to remove the chemical agents used in the extraction.  (Farnan Dec. ¶ 5). Plaintiff was wearing shorts, and defendant Farnan checked his blood pressure, pulse, and respirations.  (*Id; see also* Ex. A to Farnan Decl.).  Defendant Farnan did not see any marks, bruising, or swelling, and plaintiff did not state that he had sustained any injury.  (Farnan Decl. ¶ 5–6; Ex. A to Farnan Decl.).  Plaintiff testified that defendant Farnan asked him questions, but he no longer remembered what those questions were.  (Pl.'s Dep. 128).  Plaintiff concluded that the examination was "unprofessional" because the exam was only visual, and defendant Farnan did not use special tools for his eyes and ears, similar to previous exams he had received in clinics and the hospital.  (Pl.'s Dep. 129–30).

Defendant Farnan concluded that no medical treatment was necessary, and plaintiff was escorted to the SHU without further incident.  (Farnan Decl. ¶ 8–9).

Defendant Fitzgerald assessed plaintiff visually and stated that plaintiff did not indicate anything was wrong, and defendant Fitzgerald had no reason to think otherwise, because plaintiff had complied with orders issued during the cell extraction.  Likewise, defendant Farnan visually examined plaintiff and took his vital signs after chemical agents were used to remove plaintiff from his cell. Plaintiff did not claim that anything was wrong with him, and defendant Farnan did not discover any injuries indicating plaintiff could be in pain or was having any medical issues after the decontamination shower.

No issue of fact exists as to whether plaintiff had a serious medical need on August 24 and 25, 2008.  Plaintiff's alleged bruises and scratch, which were too slight to be noticed by defendants Farnan and Fitzgerald, and too minimal for plaintiff to mention when they examined him, do not constitute a serious medical need.

Even if plaintiff had a serious medical need, defendants Fitzgerald and Farnan were unaware of it, and thus were not deliberately indifferent.  Plaintiff alleges that he was in serious pain, but failed to so indicate both times when he was being examined.  It is clear from defendant Farnan and Fitzgerald's

33

declarations that they examined plaintiff to the extent they deemed necessary in their medical judgment, as supported by their observation of plaintiff and his failure to indicate anything was wrong.  Plaintiff may disagree with their method and extent of medical care, but even if it were to rise to the level of malpractice, which this court does *not* hold, defendant Farnan and Fitzgerald's actions would not rise to the level of a constitutional violation. Accordingly, this court recommends summary judgment as to plaintiff's medical care claims against defendants Fitzgerald and Farnan.

### B.      Excessive Force

Plaintiff alleges that various corrections officers and a "distraction" unit used excessive force against him on August 24 and 25, 2008.

### 1.      Legal Standards

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights.  *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000).  To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective

elements. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be "'inconsistent with the contemporary standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson*, 503 U.S. at 7). In determining

whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:  the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response."  *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

### 2.    Application

Plaintiff alleges that, after he committed an aggravated assault on August 24, 2008, he was put in full restraints and "assaulted" in the back of his cell by unnamed defendants.  (First Am. Compl. ¶¶ 20, 40; *see also* Pl.'s Dep. 56). Plaintiff testified that he was put in restraints without incident, but that the restraints were too tight on his wrists and ankles, and that corrections officers had him lie prone on the floor and pushed on his back, making it difficult for plaintiff to breathe.  (Pl.'s Dep. 64, 67).  Plaintiff alleges that he suffered bruises and swelling from the tight restraints, but that they healed within two weeks, and he was left with a "scar from the bruises and the scrape—the scratch."  (Pl.'s Dep. 70).

Plaintiff alleges that, after the incident, he was examined by Nurse Fitzgerald, taken from his cell, and sent to an observation cell.  The last sentence

36

of the paragraph states that defendants Hogan, Bosco, and Waldron were "responsible."  Defendant Hogan is the Commissioner of OMH and defendants Bosco and Waldron are "unit chiefs."  (First Am. Compl. ¶ 20).  Plaintiff has not identified the individuals who were directly involved in the alleged assault and he has improperly named defendants Hogan, Bosco, and Waldron in connection with this incident based merely on their supervisory positions.  Having failed to name anyone who was personally involved in the alleged excessive force, defendants should be granted summary judgment as to plaintiff's claims based on the alleged use of excessive force on August 24, 2008.

Plaintiff claims that on the morning of August 25, 2008, he was sleeping when approximately three unknown corrections officers entered plaintiff's cell and started punching and kicking him while he was on his bed.  (Pl.'s Dep. 88–90).  Plaintiff tried to block the punches, and after about two or three minutes, the corrections officers left.  (Pl.'s Dep. 90).  Plaintiff claims that a few minutes later on August 25, 2008, Sergeant Rendle and two other corrections officers entered his cell and repeatedly punched and kicked him.  (Pl.'s Dep. 72–80).  Plaintiff alleges that without provocation, Sergeant Rendle punched him about five times in the "face area," kicked him twice in the testicles, and punched him three or four times in the "stomach area."  (Pl.'s Dep. 75–77).  Plaintiff said that he resisted the

37

assault by punching and kicking the officers, and that after about three minutes,
they abruptly left.  (Pl.'s Dep. 81–82).  Plaintiff testified that the "only evidence"
of being assaulted was swelling and bruising on his face.  (Pl.'s Dep. 93–94).

Later that day, plaintiff testified that Sergeant Rendle told plaintiff to get
dressed so he could return to his cell in the SHU.  (Pl.'s Dep. 101).  Plaintiff said
that he and Sergeant Rendle exchanged "disrespectful statements," and he told
Sergeant Rendle, "The door is locked, but when I catch you, you know I'm going
to hurt you."  (Pl.'s Dep. 101–02).

Sergeant Rendle's report states that when he arrived at plaintiff's cell,
plaintiff was standing in his cell with something in his right hand.  (Ex. A to Pl.'s
Resp. Opposing Defs.' Mot. for Summ. J. 36).  Sergeant Rendle ordered plaintiff
several times to drop what he was holding in his hand, after which plaintiff threw
it against the door of the cell and retrieved what appeared to Sergeant Rendle to be
feces from the toilet.  *Id.*  Sergeant Rendle's report indicates that plaintiff
continued to refuse to comply, even after chemical agents were used, so the
extraction team entered and restrained plaintiff.  *Id.*

Plaintiff disputes the reason why an extraction team came to plaintiff's cell
on August 25, 2008, and plaintiff claims that he complied with instructions and
stood with his back to the door so he could be handcuffed.  (Pl.'s Dep. 103–04).

Plaintiff claims that Sergeant Rendle started spraying mace at plaintiff without provocation or warning. (Pl.'s Dep. 104–05). Plaintiff claims that when the members of the extraction unit told him to get on the floor, and he complied. (Pl.'s Dep. 105–07). Plaintiff testified that after he was handcuffed, no more mace was sprayed. (Pl.'s Dep. 117). The chemical agent affected plaintiff's eyes and his breathing, and within a minute he was taken to the decontamination shower, and within seven minutes, the effects from the chemical agent were gone. (Pl.'s Dep. 113, 115).

Plaintiff was placed in restraints and removed from his cell, and an unnamed officer placed plaintiff's arm in an "unprofessional hold." (Pl.'s Dep. 109). Plaintiff alleges that swelling and bruises resulted, but eventually went away. (Pl.'s Dep. 110–11). Defendant Marcil was not present with the extraction team on August 25, 2008, and plaintiff has therefore failed to establish personal involvement as to defendant Marcil and the alleged excessive use of force on August 25, 2008. (*See* Ex. A to Allan Decl.; Marcil Decl. ¶ 8). The other officers on the extraction team are not defendants in this action.[16]

Plaintiff also claims that defendants Uhler and Allan are responsible for the

---

[16] The Use of Force Report dated August 25, 2008, indicates that R. Rendle, M. Chagnon, N. Moore, E. Owen, and T. Saunders assisted on the extraction team, none of whom were named as defendants in this action. (Ex. A to Allan Decl.).

use of excessive force against him on August 25, 2008.  Defendant Uhler was a

captain at Clinton in August 2008, and was responsible for reviewing all Unusual

Incident and Use of Force Reports to ensure that the force applied was

appropriate.  He also consulted with the Deputy Superintendent of Security

regarding unusual incidents.[17]  (Uhler Decl. ¶¶ 4–6).  Defendant Uhler affirmed

that he was not present when plaintiff was extracted from his cell, but he was

notified that plaintiff was refusing to obey orders from staff to exit his cell.  (Uhler

Decl. ¶ 11).  Defendant Uhler consulted with defendant Racette about plaintiff's

refusal, and after attempts at negotiation failed, Deputy Superintendent for

Security Racette authorized the use of chemical agents to remove plaintiff from his

cell.  (Uhler Decl. ¶¶ 11–12).

Defendant Allan was one of the lieutenants in charge of the Correction

Emergency Response Team (CERT) at Clinton in August 2008.  (Allan Decl. ¶

4–5).  Defendant Allan affirmed that he was called to plaintiff's cell on August 25,

2008, and he attempted to convince plaintiff to comply with orders to exit his cell

---

[17] On August 26, 2008, defendant Uhler reviewed the Unusual Incident reports and videotape of plaintiff's extraction, and concluded that the force applied was appropriate.  (Uhler Decl. ¶¶ 14–15).  Defendant Uhler also reviewed the Unusual Incident Report, Sergeant Rendle's report, the videotape of the incident, and testimony from OMH staff, and concluded that the force was appropriate, plaintiff understood his actions at the time, and plaintiff refused to attend the Tier III hearing to defend himself.  (Ex. A to Pl.'s Resp. Opposing Defs.' Mot. for Summ. J. 38).

so he could be escorted back to the SHU.  (Allan Decl. ¶¶ 7–9).  Defendant Allan

affirmed that plaintiff continued to ignore orders to exit his cell, and defendant

Allan then ordered Sergeant Rendle to use force to extract plaintiff from his cell.

Sergeant Rendle sprayed two one-second bursts of chemical agent a total of five

times at plaintiff.  (Allan Decl. ¶ 11).  Defendant Allan affirmed that even after the

chemical agent was sprayed, plaintiff still would not exit his cell.  (Allan Decl. ¶

12).  The extraction team then entered plaintiff's cell and using body holds, placed

plaintiff in restraints and escorted him to the decontamination shower.  (Allan

Decl. ¶ 13).  Plaintiff was examined by defendant Nurse Farnan, who found no

injuries.  (Ex. A to Allan Decl.).

     The only defendant plaintiff names who was personally involved with the

use of force on August 25 is Lieutenant Allan, who was present and directed

Sergeant Rendle to spray chemical agents before the extraction team entered

plaintiff's cell.  Resolving any inferences in favor of plaintiff, an issue of fact

exists as to whether the application of force was warranted.  Plaintiff alleges that

he was compliant with orders and was up against the door waiting to be escorted

back to the SHU when Lieutenant Allan ordered Sergeant Rendle to spray the

chemical agent without provocation.  If plaintiff was complying with orders to exit

the cell and was not resisting, the use of the chemical agent may constitute a use of

excessive force.  Accordingly, the court will not recommend granting summary judgment in favor of defendant Allan as to plaintiff's complaint based on the alleged use of excessive force on August 25, 2008.  However, defendants should be granted summary judgment as to plaintiff's complaints based on the alleged use of force as to all other named defendants.

### D.    Conditions of Confinement

In order to state a valid conditions-of-confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference."  *Wilson v. Seiter,* 501 U.S. 294, 297–99 (1991) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir. 1996)).  To satisfy the objective element, the plaintiff must demonstrate that the conditions under which he or she was confined resulted "in unquestioned and serious deprivations of basic human needs."  *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985) (*citing Rhodes*, 452 U.S. at 347).  The Eighth Amendment is implicated for example, "when inmates are denied 'essential food, medical care, or sanitation," or when conditions are such that the threat of violence among inmates is increased."  *Morgan v. Ward*, 699 F. Supp. 1025, 1054 (N.D.N.Y. 1988) (conditions of confinement in Clinton SHU did not violate Eighth Amendment).

When correction officials deny a prison inmate the measure of food necessary to maintain health, the Eighth Amendment's prohibition against cruel and unusual punishment is implicated. *Robles v. Coughlin*, 725 F.2d 12, 15–16 (2d Cir. 1983). "If, on the other hand, meals, are withheld from a prisoner on an isolated basis, such conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance." *Cruz v. Church*, 9:05-CV-1067, 2008 WL 4891165, at *12, 2008 U.S. Dist. LEXIS 91022 (N.D.N.Y. Nov. 10, 2008) (citations omitted).

### 1.    Denial of Food

Plaintiff alleges that from January 5, 2009, through January 18, 2009, he went "ten days of no food and four days [when plaintiff] was fed one meal a day which [he] refused to eat because they spit in it or put dirt in it." (First Am. Compl. ¶¶ 34, 50). The amended complaint implies that defendants Moseley and Besaw were the corrections officers who were responsible for serving breakfast and lunch during this time period. Plaintiff claims that, on January 13, 2009, he complained to defendants Artus and LaValley that he was not being fed, and they did nothing. (First Am. Compl. ¶ 34). The amended complaint also mentions defendants Poupore, Tetreault, Finnell, and Boulrice in the same paragraphs where the food deprivations are discussed, but says nothing about how they were

involved.  (First Am. Compl. ¶¶ 34, 50).

Plaintiff states that he spoke with defendants Moseley and Besaw about his lack of food on January 18, 2009, when he said they "investigated" why the "pink feed-up sheet" indicated plaintiff was on a "restricted diet."  (First Am. Compl. ¶ 34).  Plaintiff claims defendants Moseley and Besaw told plaintiff that he had been placed on a restricted diet in error, and that was when he was "served lunch and [he] ate regular[ly]."  (First Am. Compl. ¶ 34).

The only grievance filed by plaintiff during this time related to food was filed on January 15, 2009, accusing defendant Tetrault of denying plaintiff one meal on January 12, 2009, an isolated incident that would not rise to the level of a constitutional violation, even if true.  (Dkt. No 150-4 p. 4; *see Cruz, supra*).  A subsequent investigation revealed that plaintiff had refused morning and afternoon meals on January 12, 2009.  (Dkt. No. 150-4 p. 5).  Plaintiff appealed the grievance to the Central Office Review Committee, which denied plaintiff's appeal based on the findings of the investigation.  (Dkt. No. 150-4 p. 2).

Defendant Moseley affirmed that he was assigned as Third Officer in the SHU in 2009, and when he was on duty in the SHU, he was responsible for delivering food trays to inmates confined in the SHU.  (Moseley Decl. ¶¶ 4–5). Defendant Moseley affirmed that he never denied plaintiff food, never spit or put

44

dirt in plaintiff's food, and had no recollection of plaintiff complaining about problems with his meals.  (Moseley Decl. ¶¶ 6–8).

Defendant Besaw affirmed that in January 2009, he was assigned as a Relief Officer at Clinton, and when on duty in the SHU, he sometimes was responsible for delivering food trays to inmates confined in the SHU.  (Besaw Decl. ¶¶ 4–5). Defendant Besaw affirmed that he never denied food to plaintiff, never spit or put dirt in plaintiff's food, and had no recollection of plaintiff complaining about problems with his meals.  (Besaw Decl. ¶¶ 6–8).

Defendant Poupore[18] was assigned as a Corrections Officer in the SHU at Clinton in January 2009, and sometimes was responsible for delivering food trays to inmates confined in the SHU.  (Poupore Decl. ¶¶ 4–5).  Defendant Poupore affirmed that he never denied plaintiff food, never spit or put dirt in plaintiff's food, and had no recollection of plaintiff complaining about problems with his meals.  (Poupore Decl. ¶¶ 6–8).

Defendant Tetreault was assigned as a Corrections Officer in the SHU at Clinton in January 2009, and was sometimes responsible for delivering food trays to inmates confined in the SHU when he was on duty.  (Tetreault Decl. ¶¶ 2–3).

_____

[18] Plaintiff spells defendant Poupore's name "Poupoure," but defendant Poupore's Declaration indicates that the proper spelling is "Poupore."  The court will refer to this defendant as "Poupore."

Defendant Tetreault affirmed that he never denied plaintiff food, never spit or put dirt in plaintiff's food, and had no recollection of plaintiff complaining about problems with his meals.  (Tetreault Decl. ¶¶ 4–6).

Defendant Finnell is a Resource Officer who was sometimes assigned to the SHU at Clinton in January 2009, and was sometimes responsible for delivering food trays to inmates confined in the SHU.  (Finnell Decl. ¶¶ 2–3).  Defendant Finnell affirmed that he never denied plaintiff food, never spit or put dirt in plaintiff's food, and had no recollection of plaintiff complaining about problems with his meals.  (Finnell Decl. ¶¶ 4–6).

Defendant Artus was the Superintendent at Clinton from July 2003 through April 2010.  (Artus Decl. ¶ 4).  Superintendent Artus's responsibilities included making weekly rounds, including to the SHU, and he remembers speaking to plaintiff on occasion.  (Artus Decl. ¶¶ 6–7).  Superintendent Artus does not recall ever speaking to plaintiff about the claims he makes in this case, but affirmed that he would have delegated any written complaints from plaintiff to a deputy superintendent for resolution.  (Artus Decl. ¶ 7–9).

Defendant LaValley was the First Deputy Superintendent at Clinton from February 2008 through September 2009.  (LaValley Decl. ¶ 4).  As First Deputy Superintendent, defendant LaValley ensured inmates received appropriate mental

health care and therapy programs at Clinton based on their assessed need, as determined by mental health staff.  (LaValley Decl. ¶ 8).

Defendant Marcil is a sergeant at Clinton and is in charge of maintaining security in the SHU.  (Marcil Decl. ¶ 4).  Defendant Marcil affirmed that plaintiff was under a cell shield order in January 2009, due to his history of throwing urine and feces through his cell door.  (Marcil Decl. ¶ 16).  The cell shield order directs that a clear shield be placed in front of the inmates cell and a specific procedure is followed to provide the inmate with food through the feed-up door.  (Marcil Decl. ¶¶ 12–15).  The SHU logbook entries for January 5 through January 18, 2009, record that plaintiff received breakfast and lunch on January 5 and 11, 2009, but refused his dinner meal.  (Marcil Decl. ¶¶ 19, 22; Ex. B to Marcil Decl.)  Plaintiff refused all meals on January 6, 7, 8, and 9, 2009.[19]  (Marcil Decl. ¶ 20; Ex. B to Marcil Decl.).  Plaintiff received all meals on January 10, 14, 15, 16, 17, and 18, 2009.  (Marcil Decl. ¶ 21; Ex. B. to Marcil Decl.).  Plaintiff refused his breakfast meal, refused to comply with the feed-up procedures[20] at lunch (thereby denying his lunch meal), and received his dinner meal on January 12, 2009.  (Marcil Decl.

---

[19] Plaintiff was also under medical observation as of January 9, 2009, and medical staff was monitoring when he was eating, whether or not he was drinking, and if he appeared hydrated or ill.  (*See* Progress Notes for January 9, 2009–January 18, 2009, Dkt. No. 151).

[20] *See* Clinton Special Housing Unit #14 Procedure XI(A)(1)(d), Ex. C to Marcil Decl.).

¶ 23; Ex. B to Marcil Decl.).  Plaintiff refused his breakfast and dinner meals, but received his lunch meal on January 13, 2009.  (Marcil Decl. ¶ 24; Ex. B to Marcil Decl.).

Plaintiff's conclusory allegations fail to identify who, if anyone, deprived him of food in January 2009.  The declarations and documentary evidence proffered by the defendants indicate that the times plaintiff did not receive food, he refused it, or refused to comply with the feed-up procedure.  *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case").  Plaintiff provided no factual support for his claim that any defendant spit or put dirt in his food, his purported excuse for refusing certain meals.  *See George v. Conway*, No. 05-CV-510A , 2009 WL 1449046, at *12-13 (W.D.N.Y. May 21, 2009) (plaintiff has failed to submit any evidence to support his claim that his meals were tampered with or to identify those individuals who tampered with it;  his unsubstantiated and wholly conclusory allegations are insufficient to defeat defendants' motion for summary judgment).  To the extent plaintiff missed meals as a result of his unjustified refusal to accept the food offered to him, he cannot sustain an Eighth Amendment violation.  *See, e.g.*, *Tapp v. Proto*, 718 F. Supp. 2d 598, 621 (E.D. Pa. 2010)

(because plaintiff has not shown that his weight loss was the result of an insufficiently nutritious diet as opposed to his frequent refusal to eat meals because he felt they were inadequately warm and lacked variety, his claims cannot survive summary judgment).  To the extent that plaintiff was not served meals because of his failure to follow feed-up procedures, or his propensity for throwing feces at corrections officials, he similarly fails to support an Eighth Amendment claim, particularly in the absence of any evidence of any significant damage to his health.  *See, e.g., Freeman v. Berge*, 441 F.3d 543, 545, 547 (7th Cir. 2006) (upholding judgment as a matter of law against plaintiff whose persistent failure to abide by prison rules in connection with receiving meals undermined his Eighth Amendment claim; "to an overwhelming degree plaintiff's food deprivation was self-inflicted," and the record contains no evidence that he experienced real suffering, extreme discomfort, or any lasting detrimental health consequences, despite a significant weight loss).

Based on the declarations and documentary evidence cited above, no reasonable fact finder could conclude that any defendant subjected plaintiff to a sufficiently serious deprivation of food from January 5 through January 18, 2009, or that they acted with deliberate indifference.  Plaintiff's bare allegations that defendants denied him food, without more, are not sufficient to defeat defendants'

factually-supported motion for summary judgment with respect to plaintiff's

Eighth Amendment claim.  *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d

Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the

credibility of the parties at the summary judgment stage, in the rare circumstance

where the plaintiff relies almost exclusively on his own testimony, much of which

is contradictory and incomplete, it will be impossible for a district court to

determine whether 'the jury could reasonably find for the plaintiff,' . . .  and thus

whether there are any "genuine" issues of material fact, without making some

assessment of the plaintiff's account." (citation omitted)).

### 2. Deprivation of Property and Repair of Pipes

Conditions of confinement are not cruel and unusual for Eighth Amendment

purposes simply because they are "restrictive and even harsh."  *Anderson*, 757

F.2d at 35.  Rather, many unpleasant aspects of prison life "are part of the penalty

that criminal offenders pay for their offenses against society."  *Id*. (citation

omitted).  Thus, an inmate who claimed that he was deprived "of his belt, shoe

laces, and personal property for seven days, subjected to 24-hour observation,

placed with mentally ill inmates, denied a change of 'Greens,' and otherwise

subjected to the regulations governing inmates in the MHU" did not establish an

objectively serious deprivation.  *Salahuddin v. Dalsheim*, 94 CIV. 8730, 1996 WL

384898, at *14 (S.D.N.Y. Jul. 9, 1996).  Significantly, the plaintiff in *Salahuddin* did not have a mental health designation which would have supported his confinement in the mental health unit.  *Salahuddin*, 1996 WL 384898, at *3.

Here, plaintiff fails to establish that some of the alleged deprivations were extreme.  Plaintiff alleges he lacked writing utensils, paper, grievance forms, envelopes, and was exposed to noisy pipes—these deficiencies do not amount to a denial of the minimal measure of life's necessities.  Plaintiff further alleges he was extremely cold,[21] had only a short-sleeved green state shirt, no sheets, blanket, soap, washcloth, pillow, pillowcase, towel, sweatshirt, toothbrush, toothpaste,[22] or

---

[21] *See, e.g., Smith v. Burge*, No. 9:03-CV-0955, 2006 WL 2805242 at *7 (N.D.N.Y. Sept. 28, 2006) (confinement of inmate, for less than one day, in a T-shirt and underwear, in a cell with an open window, exposing him to "cold" or "very cold" temperatures, was not sufficiently prolonged or severe to rise to the level of an Eighth Amendment violation); *Borges v. McGinnis*, 03-CV-6375 , 2007 WL 1232227, at *4–6, 2007 U.S. Dist. LEXIS 30865 (W.D.N.Y. Apr. 26, 2007) (keeping inmate, clothed only in paper gown and slippers, with a thin mattress and no blanket, in a room with an open window that reduced the temperature to approximately 50 degrees, for three days, did not meet the objective element of an Eighth Amendment violation); *Grant v. Riley*, 89 Civ. 0359, 1993 WL 485600 at *4, 1993 U.S. Dist. LEXIS 16605 (S.D.N.Y. Nov. 24, 1993) (confining inmate for three days, in an unheated room with a cold wind blowing through a broken window, and denying him a coat, bedding or blankets for over nine hours, failed to allege treatment that offends concepts of dignity, civilized standards, humanity, and decency, as required to state an Eighth Amendment cause of action).

[22] *See, e.g,, Fernandez v. Armstrong*, No. 3:02CV2252, 2005 WL 733664, at *5, 2005 U.S. Dist. LEXIS 4958 (D. Conn. Mar. 30, 2005) (denial of hygiene items including a toothbrush, toothpaste, soap, and shampoo for a period of sixteen days does not allege a violation of Eighth Amendment rights (citations omitted)); *Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003)  (holding that "[d]eprivation of . . . toiletries [other than toilet paper] for approximately two weeks–while perhaps uncomfortable–does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference.'" (quoting *Farmer*, 511 U.S. at 837); *Chavis v. Kienert*, No. 9:03-CV-0039, 2005 WL

toilet paper for six days.  (*See* First Am. Compl. ¶ 30).  Such conditions may have been unpleasant for plaintiff, but he has failed to establish an issue of fact as to if the conditions were wantonly imposed for the unnecessary infliction of pain or that they posed a threat to his health or safety.

Plaintiff claims that he was deprived of certain items after he attempted to assault staff on January 5, 2009.[23]  (First Am. Compl. ¶ 30).  The Contraband Receipt related to the January 5, 2009 incident indicates that plaintiff's state-issued pants, shirts, blankets, sheet, mattress, sneakers, net bag, towel, and pillow were all contaminated by plaintiff with feces and urine, and were therefore disposed of.  (Ex. A to Racette Decl.; *see also* SHU logbook entry for January 5, 2009, Ex. B. to Marcil Decl.).  As Deputy Superintendent for Security at Clinton, defendant Racette reviewed the reports related to the January 5, 2009 incident, but affirmed that he did not personally confiscate any items from plaintiff's cell. (Racette Decl. ¶¶ 4–14).

---

2452150, at *21, 2005 U.S. Dist. LEXIS 41920 (N.D.N.Y. Sept. 30, 2005) (denial of toiletries for a two-month period did not rise to the level of deliberate indifference to the prisoner's health or safety)).

[23] To the extent plaintiff is alleging a due process claim (as opposed to an 8th Amendment conditions of confinement claim) for the alleged deprivation of property, it is well-settled that where post-deprivation remedies are available, intentional deprivation of property by a state employee does not violate the Due Process Clause.  *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984).  New York provides an adequate post-deprivation remedy through a Court of Claims action.  (*Davis v. New York*, 311 Fed. App'x 397, 400 (2009) (citing *Jackson v. Burke*, 256 F.3d 98, 96 (2d Cir. 2001); *Love v. Coughlin*, 714 F.2d 207, 208–09 (2d Cir. 1983).

Plaintiff filed a grievance dated January 10, 2009, based on the alleged confiscation of his property.  (Ex. C. to LaValley Decl.).  An investigation was conducted, and as the CORC ultimately stated, "[plaintiff] was involved in an unhygienic act of throwing feces on staff on 1/5/09. . . .CORC also notes from the investigation that all of the [plaintiff's] state and personal property in his cell was contaminated and disposed of.  It is further noted that his contaminated state property was replaced with new items."  *Id.*  The CORC also stated that plaintiff retained his right to make an inmate personal property claim pursuant to Directive 2733.  *Id.*

While it is highly ironic that a plaintiff who periodically threw feces at corrections officials would complain about a lack of toilet paper, the deprivation of toilet paper for six days, as plaintiff alleges, *could* be a sufficiently serious deprivation to state an Eighth Amendment claim.  *See Trammell v. Keane*, 338 F.3d at 165 (collecting cases).  However, plaintiff's complaint does not identify who was personally involved in, or responsible for, this alleged deprivation.  *See Green v. Bauvi*, 792 F. Supp. 928, 941–42 (S.D.N.Y. 1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions).  Nor does plaintiff provide any factual support for the suggestion that some defendant acted with deliberate

53

indifference, as opposed to negligence, in connection with his supply of toilet paper. *Trammell v. Keane*, 338 F.3d at 165.[24]

In addition, plaintiff's grievance related to the alleged confiscation of property makes no statement about a lack of toilet paper or other materials. (Ex. C to LaValley Decl.). Plaintiff's grievance focuses on his argument that the property was not contaminated and should not have been destroyed. *Id.* The fact that plaintiff does not mention any lack of toilet paper in his grievance, when he was complaining about the deprivation of other items during the same time period further supports a finding that whatever deprivation he suffered, it was not serious enough to include in his grievance, and thus would not rise to the level of an Eighth Amendment violation.[25]

Plaintiff has failed to document an issue of fact as to whether a named defendant deprived him of toilet paper and acted with deliberate indifference. Without any factual support, plaintiff's bare allegation is not sufficient to survive

---

[24] "It appears that the deprivation of toilet paper was inadvertent and that, at worst, Trammell was left with one roll of toilet paper to last approximately nine days and that the defendants were negligent in replenishing Trammell's supply. Negligence does not, however, satisfy the scienter requirement necessary to support a claim for 'cruel and unusual punishment.' *See Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988) (inadvertent failure to replenish inmate's toilet paper supply for several days does not evidence mental state required to demonstrate Eighth Amendment violation)." *Id.*

[25] Plaintiff's failure to include the deprivation of toilet paper in his grievance also supports defendants' argument that he failed to exhaust administrative remedies as to that issue.

defendants' motion for summary judgment.

Plaintiff filed a grievance related to the broken pipe sound about February 2, 2009.  (Artus Decl. ¶ 12).  The grievance was investigated, and the pipe was fixed as of March 2, 2009.  (Artus Decl. ¶ 12; Ex. A to Artus Decl.).  Defendant Artus responded to plaintiff's grievance, stating that the requested repair was completed. (Ex. A to Artus Decl.).  Plaintiff appealed to the CORC, asking if there was a "financial difficulty" at Clinton, and the CORC upheld the Superintendent's determination that the repair had been completed, and the "CORC has not been presented with sufficient evidence necessary to substantiate any malfeasance by staff."  (Ex. A. to Artus Decl.).  Plaintiff has provided no evidence that the alleged broken pipe deprived him of a life necessity, nor that defendant Artus, the sole defendant plaintiff claims was responsible, acted with deliberate indifference. Rather, it appears that Clinton staff responded to plaintiff's grievance by repairing the problem, not by being indifferent to it.  Additionally, defendant Artus was not personally involved with the repair of the pipes.  Thus, defendants should be granted summary judgment as to plaintiff's claims based on deprivation of property and the alleged failure to repair broken pipes.

## VII.  <u>Qualified Immunity</u>

Defendants assert that they are entitled to qualified immunity in connection

with plaintiff's claims.  In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001), modified by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory" in all cases).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201.  This court need not address qualified immunity with respect to plaintiff's various causes of action because, as discussed above, defendants should be granted summary judgment as to all of plaintiff's remaining claims.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' summary judgment motion (Dkt. No. 150) be **DENIED in part as to plaintiff's claims based on the use of excessive force on August 25, 2008, as to defendant Allan**, and it is further

**RECOMMENDED**, that defendants' summary judgment motion (Dkt. No. 150) be **GRANTED in part**, and the complaint **DISMISSED WITH PREJUDICE IN ITS ENTIRETY AS TO ALL OTHER DEFENDANTS AND ALL OTHER CLAIMS**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 11, 2012

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**